# EXHIBIT 1



VIA Facsimile #513-621-5947

**Worldwide Headquarters**
Ionics, Incorporated
65 Grove Street
Watertown, Massachusetts
02472-2882 USA
Tel: (617) 926-2500
Fax: (617) 926-4304
www.ionics.com

February 7, 2003

Global Energy, Inc.
312 Walnut Street
Suite 2000
Cincinnatti, OH 45202

Attention: Ms. Jennifer Moore

Re: Confidentiality Agreement with Ionics

Dear Ms. Moore:

Enclosed is a revised Confidentiality Agreement signed by our Chief Financial Officer, Dan Kuzmak, and a marked copy showing the changes we have made.

Very truly yours,

Stephen Korn
Vice President and
General Counsel

cc: Daniel M. Kuzmak

*JJ - see changes - if you accept - - sign & will fax back.*

email — dkurmah@ionics.com

# CONFIDENTIAL DISCLOSURE AGREEMENT

Agreement made as of 6th day of February 2003 between Rick Hasselback, Hasselback Development, LLC, consulting on behalf of Ionics/Resource Conservation Company ("Hasselback Development"), a Washington corporation, whose principal offices are located at: 2855 29th Ave., West, Seattle, WA 98199, USA and Global Energy Inc., ("Global"), an Ohio corporation whose principal offices are located at: Suite 2000, 312 Walnut Street, Cincinnati, Ohio 45202, USA.

WHEREAS, Global owns and has the right to (a) furnish certain technology ("Global Technology"), including but not limited to proprietary and confidential processes, manufacturing techniques, equipment designs, test and performance data information and design information necessary to design, engineer, construct, erect and operate gasification processes that use carbon, coal and renewable fuel as a portion of the feedstock and processes that compose such feedstock, and (b) authorise the use thereof;

WHEREAS, Global owns or controls exclusive rights or patents relating to Global Technology, including but not limited to certain products and processes used in the manufacture and design of equipment, and in the design, engineering, construction, erection and operation of facilities, used for the gasification of carbon or coal with sewage sludge solids, municipal solid waste and the composition of such elements as feedstock for such gasification and has the right to license others to manufacture and sell the products and processes covered by such patents; and

WHEREAS, Hasselback Development, consulting on behalf of Ionics/Resource Conservation Company desires to make a technical and economic review of Global, its projects, and the Global Technology, and Global is willing to share certain confidential and/or proprietary information regarding Global, projects under development by Global, and the Global Technology (collectively, the "Confidential Information") to facilitate this assessment:

NOW, THEREFORE, in consideration of the premises and of the mutual covenants and agreements set forth herein, the parties hereto agree as follows:

1.  Hasselback Development agrees to be strictly bound by the confidentiality obligations set forth below in consideration of its review of the Confidential Information.

2.  (a)  Hasselback Development shall disclose the Confidential Information to only those employees, of itself, who have executed a Confidentiality Agreement with Hasselback Development and to each subsidiary of Hasselback Development who has executed an extension letter agreeing to abide by the terms and conditions of this agreement and who are directly involved in the discussions regarding Hasselback Development's participation in any Global project and the review of Global Technology. Hasselback Development shall advise such employees and any employees of any of its subsidiaries upon disclosure of the confidential nature of the material and the terms of this Agreement.

~~(b)  Should any employee or representative of Hasselback Development or any of its subsidiaries, assigned to, or involved in, the review of the Global Technology, make any inventions as a result of use of the Confidential Information, Hasselback Development agrees to notify Global promptly of the same in writing and the same shall be the sole exclusive property of Global. Hasselback Development agrees to execute or cause to be executed any and all patent applications, assignments or other documents required by Global to vest and retain in Global title to any and all such inventions.~~

*[handwritten margin note: other than Bones's [illegible] of independent consultants + other consultants on need to know basis]*

3. Except for such employees of Hasselback Development and any of its subsidiaries as are described in Section 2(a) hereinabove, Hasselback Development shall not, at any time, without the written consent of Global, publish or disclose to any other third party (a "Third Party"), or duplicate or use, directly or indirectly, the Confidential Information (whether, and without limitation, it relates to process, product, equipment, apparatus or any other aspect of Global Technology) for its own benefit or that of any of its employees or a Third Party. Such confidentiality obligations shall not apply to knowledge or information which:

(a)  at the time of disclosure is in the public domain or public knowledge;
(b)  after disclosure, becomes part of the public domain or public knowledge by publication or otherwise, except by breach of this Agreement by Hasselback Development; or
(c)  Hasselback Development can establish that was in its possession at the time of disclosure by Global and was not acquired, directly or indirectly from Global; or
(d)  Hasselback Development lawfully receives from any Third Party, provided; however, that such information was not obtained by such Third Party, directly or indirectly, from Global.

4. Hasselback Development agrees that it will not use the Confidential Information for any purpose other than review of the Global Technology. *[handwritten: for economic viability [illegible] Bones list to preferred equity.]*

5. Hasselback Development agrees that in the event of any breach of the terms of this Agreement, Global shall be entitled to obtain from any court of competent jurisdiction injunctive relief, which shall be in addition to any other legal remedies to which Global may be entitled.

6. (a)  All drawings, specifications, blueprints, reports and other documents, which are clearly marked 'Confidential', as well as information, improvements and ideas, developed or acquired by Hasselback Development from such confidential drawings, specifications, blueprints, reports and other documents supplied to Hasselback Development by Global shall be deemed Confidential Information. Title thereto shall be in Global at all times.

(b)  Hasselback Development its employees and representatives and the employees and representatives of any of its subsidiaries shall not make copies of the Confidential Information without Global's prior written consent, except for use by those employees described in Section 2(a) hereinabove. Upon completion

3

of the assessment of the technical aspects of the Global Technology, and projects, and upon written request by Global, Hasselback Development and/or any of its subsidiaries shall promptly deliver to Global all copies of the Confidential Information which are in the possession or under the control of or any of its subsidiaries, including, without limitation, all copies of such confidential drawings, specifications, blueprints, reports and other documents which have been prepared or developed by Hasselback Development or any of its subsidiaries or supplied to Hasselback Development or any of its subsidiaries by Global.

7. No right or license is granted by Global to Hasselback Development or any of its subsidiaries to use the Confidential Information of Global.

8. The confidentiality obligations of Hasselback Development and its subsidiaries under this Agreement shall continue for a period of ten (10) years from the effective date shown above. *5 years*

9. This Agreement shall be governed and construed in accordance with Ohio law.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their duly authorised officers.

Rick Hasselback
Hasselback Development, LLC.
Consulting on behalf of Ionics/Resource Conservation Company

By: *[signature]*
Rick Hasselback

Its: *[signature]* Principal

Global Energy, Inc.

By: *[signature]*
H H Graves

Its: President & CEO



January 29, 2003

Confidential

Mr. Gary Podrabsky
President & CEO
Resource Conservation Company

Via Telefax: (868) 679-3725
(425) 828-0526

Dear Gary,

In follow-up to our recent discussions, please find the attached transaction summary that we would suggest as a positive way forward regarding the RCC Balance at Wabash. In general, we have had strong support from our suppliers during this challenging period of Operations at Wabash caused by our customer's availability problems. We are thankful to you for your cooperation and support to-date. We all expected that the utility customer transaction that had reached the stage of full documentation would complete after working on it throughout all of 2002. However, we are pleased that the ultimate solution has a win-win benefit for all stakeholders as the Wabash GT enables the facility to run baseload on SG while our utility neighbor is able to follow system load requirements and peak on NG. The attached materials will provide confidential information on the Wabash GT. We anticipate Wabash GT operations in 2004 yielding $2 million EBITDA per month and continuing for 20 years under the Power Purchase Agreement. The approach we recommend for RCC combines a preferred equity payout from the Wabash GT and a Technology Alliance Agreement whereby your Zero Liquids Discharge (ZLD) system will be specified with each of our E-GAS$^{TM}$ Technology licensed projects.

Please call to discuss these proposals further at your earliest convenience. Thank you for your support.

Best Regards,

H.H. Graves
President & CEO

**Confidential**

## Transaction Summary

Transaction: Convert $1,951,913.18 RCC balance (@ 12/31/02) to Wabash River Energy Ltd. (WRE), Preferred Equity and sign a Technology Alliance Agreement for the RCC ZLD system to be specified in EGAS™ Technology licensed projects for the earlier of 5 years or $20 million in RCC ZLD system revenue.

WRE Preferred Equity: In consideration of clearing the RCC Balance, WRE will issue preferred WRE shares to RCC that have a preferred right to 10% of WRE net cash flow until $2 million has been received. The shares may be purchased back by WRE for $2M at anytime and RCC shall have the right to a mandatory redemption of the shares for $2M at the end of 2 years from conversion date. For reference, WRE is insured for $300M and has warehouse inventory (equipment) of $14M.

Alliance Agreement: GE, Inc. and RCC will enter an Alliance Agreement whereby the RCC ZLD system is specified in all EGAS™ Technology licensed projects for the earlier of 5 years or $20 million in RCC ZLD system revenue. For reference, the EGAS™ Technology was originally developed by Dow Chemical for $1 Billion and in 2001 was valued at $342 million (PricewaterhouseCoopers Valuation Report for GE Inc.). Projected License projects for EGAS™ Technology exceeding 200 through 2020.

Completion Timing: <2/15/03>

01/30/03 CMC

## Transaction Summary

- $1.9M AP to IONICS RCC @ 2/18/03

- Convert AP to WRE Preferred Equity with the following specific rights:

    o Priority net cash flow return from WRE as defined below:

        - WRE Net Cash Flow = Net Proceeds from Accounts Receivable related to four (4) Cinergy/PSI Invoice claims currently in arbitration; Net Proceeds from any Section 29 transaction; and 50% of Net Proceeds from the Wabash GT operations ($250K minimum/month), all not to exceed $2M. Net Proceeds shall be amounts available after operating expenses and any priority claims.

    o GE, Inc. will issue a guarantee to IONICS RCC in conjunction with the debt to equity conversion to repurchase the WRE Preferred Equity for $2M, or any remaining balance due, after the first six (6) months of operation of the new Wabash GT and in any even no later than 6/30/04.

    o GE, Inc. retains the right to redeem IONICS RCC preferred equity in WRE at any time for $2M, subject to IONICS RCC share option described below.

- IONICS RCC will have the Option to convert the $2M WRE Preferred Equity payment to GE, Inc. shares at any time until full cash payment of $2M received by IONICS RCC.

- GE, Inc. share price for the conversion option shall be $120.50 per share based on 5,032,039 issued and 10,000,000 authorized GE, Inc. shares.

- In the event that IONICS RCC selects the share option, GE, Inc. will sign a guarantee to repurchase the shares for $2M at any time up until five (5) years from share option selection.

2/20/03

## Alliance

- Specify IONICS RCC ZLD System for all E-GAS$^{TM}$ Technology licensed projects.

- Term shall be later of $20 million in sales revenue to IONICS RCC or five (5) years.

- Parties shall cooperate to continue to develop and optimize the E-GAS$^{TM}$ Technology and IONICS RCC ZLD System combination.

- ZLD System sales subject to reasonable competitive standard on pricing and terms. For reference, the current IONICS RCC ZLD System at Wabash cost approximately $1.7 million.

April 10, 2003                                                                 Preliminary DRAFT

## ALLIANCE AGREEMENT

THIS ALLIANCE AGREEMENT ("Agreement") is made and entered into as of this ___ day of April, 2003, by and between IONICS RCC -- Resources Conservation Company, with offices at: 3006 Northup Way, Bellevue, WA 98004, USA ("IONICS RCC"), and Global Energy, Inc., an Ohio Corporation, with offices at: Suite 2650, 312 Walnut Street, Cincinnati, Ohio 45202, USA ("GLOBAL"). IONICS RCC and GLOBAL may be referred to herein individually as a "Party" and/or collectively as the "Parties".

WITNESSETH:

WHEREAS, IONICS RCC and GLOBAL desire to enter into this Agreement to cover certain matters contemplated by both Parties; and

WHEREAS, GLOBAL develops, licenses, finances, constructs, own and operates multi-fuel, E-GAS™ Technology Gasification Projects worldwide;

WHEREAS, IONICS RCC owns the IONICS RCC Zero Liquid Discharge ("ZLD") System and provides such Systems to Projects including GLOBAL'S E-GAS™ Technology Wabash River Energy Ltd Project in Terre Haute, Indiana; and

NOW, THEREFORE, in consideration of the mutual covenants, representations and warranties herein contained, and intending to be legally bound, IONICS RCC and GLOBAL agree as follows:

1. As used in this Agreement:

"Affiliate" means with respect to either Party (a) each Person that such Party controls, (b) each Person that controls such Party and (c) each Person that is under common control with such Party.

"Control" means with respect to any Person, including a Party, the power, directly or indirectly through one or more intermediaries, to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

"Event of Default" will have the meaning ascribed to it in Section 9.5.

"Gasification Project" means any E-GAS™ Technology project that includes an operating facility that utilizes that produces SG (synthesis gas) by combining a fuel or hydrocarbon, such as coal, pet coke, natural gas, or any such solids, liquids, or gases, with oxygen and steam.

"GLOBAL Affiliate" means GLOBAL and/or any Affiliate of GLOBAL, where GLOBAL owns more than 50% of the Equity in the Affiliate.

"IONICS RCC Affiliate" means IONICS RCC and/or any Affiliate of IONICS RCC.

April 10, 2003                                                                                                          Preliminary DRAFT

"Party" or "Parties" will have the meaning ascribed to it in the preamble.

"Person" means any individual, corporation, partnership, Limited Liability Company, limited partnership, joint venture or other entity.

"SG" or "syngas" or "synthesis gas" means a gas that contains, on a volume basis, and more than fifty percent (50%) of its components, hydrogen and carbon monoxide.

"Zero Liquid Discharge System" or "ZLD" means……..

2. Construction of this Agreement

    2.1    Wherever in this Agreement a Party's duty or obligation is expressed or implied, such duty or obligation will be construed to include the obligation of that Party to cause its Affiliates to act consistent with, and in a manner so as to effectuate the purposes and intent of, said duty or obligation and this Agreement. Such construction will apply regardless of whether the applicable provision of this Agreement includes the phrase "or will cause its Affiliate to" or other like phrase.

    2.2    If a Party hereto has an equity interest, without Control, in a corporation, joint venture, partnership or other entity which, as applicable (i) is involved in the development of a Gasification Project, or (ii) is engaged in the business of supplying IONICS RCC ZLD System in a jurisdiction where a IONICS RCC ZLD System requirement of a GLOBAL Affiliate arises, then such Party hereto will use reasonable efforts to induce such related entity to perform in accordance with the terms of this Agreement as if such related entity were an Affiliate.

    2.3    Each Party acknowledges that there may be circumstances that arise in connection with a GLOBAL Affiliate's obligation, or with an IONICS RCC Affiliate's obligation that have not been fully anticipated or covered by the terms of this Agreement. Without limiting the obligation of any entity to perform its obligations according to the terms of this Agreement, each Party agrees to use reasonable efforts to accommodate such unanticipated or uncovered circumstances with such mutually agreeable equitable adjustments or supplemental agreements as may be necessary to effectuate the purposes and intent of this Agreement. Each Party will be obligated to act in good faith in the performance and discharge of each of its obligations hereunder. "Good faith" as used in this Agreement, means that the Party obligated to act in good faith will act in earnest to achieve the purpose stated. Where a Party is required to exercise good faith in the performance of an obligation and it is unable to satisfy such obligation the other Party will have the right to demand that the Party subject to such good faith obligation demonstrate or furnish

2

April 10, 2003                                                                 Preliminary DRAFT

such supporting documentation evidencing the efforts undertaken to satisfy such obligation, as such other Party may reasonable request.

3. GLOBAL's IONICS RCC ZLD System Requirements

   3.1 GLOBAL agrees to specify IONICS RCC Zero Liquid Discharge ("ZLD") System and associated services for all E-GAS$^{TM}$ Technology Gasification projects, if such a type of ZLD System water treating is necessary for the project.

   3.2 IONICS RCC will sell and deliver to GLOBAL and/or GLOBAL's Affiliates, and GLOBAL will purchase from IONICS RCC and/or IONICS RCC Affiliates, the total present and future requirements of GLOBAL and/or GLOBAL's Affiliates E-GAS$^{TM}$ Technology Gasification projects for IONICS RCC ZLD Systems.

   3.3 With respect to IONICS RCC ZLD System, IONICS RCC will have the right, at its option, to supply the IONICS RCC ZLD System to any GLOBAL and/or GLOBAL Affiliate E-GAS$^{TM}$ Technology Gasification project to meet the water treating needs.

   3.4 If IONICS RCC is unable or unwilling to supply, or cause an IONICS RCC Affiliate to supply, any IONICS RCC ZLD System for a specific project of a GLOBAL and/or GLOBAL Affiliate facility, then IONICS RCC will provide notice to GLOBAL at the earliest practicable date following IONICS RCC's receipt of the notice of the requirement. In such event, GLOBAL will have no obligation to purchase such system from IONICS RCC.

   3.5 GLOBAL will provide written notice to IONICS RCC at the earliest practicable date prior to the date on which first delivery from IONICS RCC will be required with respect to any requirements GLOBAL may have for a IONICS RCC ZLD System that will or is expected to arise. IONICS RCC's obligation to support the design and installation of such system as provided hereunder will commence with an agreed project schedule.

   3.6 Any contract negotiated and entered into between GLOBAL and/or GLOBAL Affiliate and IONICS RCC and/or IONICS RCC Affiliate pursuant to this Agreement will have a term of not less than fifteen (15) years and will be a separate, enforceable agreement, independent of this Agreement and will remain in full force and effect according to its terms notwithstanding any termination, suspension, invalidation, or contest of this Agreement.

   3.7 IONICS RCC ZLD System sales are subject to reasonable competitive standard on pricing and terms. For reference, the current IONICS RCC ZLD System at the Wabash River Energy facility costs approximately $1.7 million.

April 10, 2003                                                                 Preliminary DRAFT

4. E-GAS™ Technology Gasification Project Development

    4.1    During the course of developing a GLOBAL and/or GLOBAL Affiliate's E-GAS™ Technology Gasification Project, GLOBAL will furnish all information, such as scheduling, pertaining to such Project to IONICS RCC on a timely basis to enable IONICS RCC to develop the parameters for supplying such Gasification Project with its requirements for an IONICS RCC ZLD System promptly, such parameters to include, without limitation, the method, cost, and timing of supplying such requirements.

    4.2    Upon receiving the information with respect to any GLOBAL an/or GLOBAL Affiliate Gasification Project as provided in Section 4.1 above, IONICS RCC would promptly develop for and furnish to GLOBAL a proposal setting forth the method for supplying such Gasification Project with its IONICS RCC ZLD System requirements.

5. Confidentiality

    5.1    Neither Party will issue any press release or photographs or otherwise publicize or disclose the terms of this Agreement without the approval of the other Party, except as such disclosure may be made in the course of normal reporting practices by a Party hereto to its shareholders or as otherwise required by applicable law.

    5.2    Each of GLOBAL and IONICS RCC (the "Receiving Party") agrees that it will not use (except to the extent necessary to fulfill its obligations under this Agreement) or communicate or divulge to any other person, any information or knowledge concerning the methods of production, promotion, sale or distribution used or employed by the other Party (the "Disclosing Party") in and about the Disclosing Party's business which may be communicated to the Receiving Party or which the Receiving Party may acquire by virtue of the terms of this Agreement; provided; however, that nothing in this Section will apply to any information or data (a) which the Receiving Party can show is now known to the public other than by the Receiving Party's improper acts or omissions; (b) the public disclosure of which is required by securities, accounting or other applicable laws or regulations; or (c) which the Receiving Party can show was already in its possession and free of any obligation of confidentiality prior to receipt from the Disclosing Party. Nothing in this Section will expand or reduce the rights or obligations of either Party pursuant to any other confidentiality agreement. Each Party will clearly identify all information to be treated as confidential by marking such information "Confidential".

6. Management and Implementation of Agreement

April 10, 2003                                                                                           Preliminary DRAFT

    6.1    Each Party will bear its own costs incurred in the performance of this Agreement.

    6.2    Each Party represents and warrants that is under no prior obligation or duty to a third party which conflicts with the performance of its obligations and duties hereunder and that is will not undertake any such obligation or duty during the term of this Agreement.

    6.3    The Parties hereto will conduct themselves as independent contractors. Nothing herein will create or be deemed to create an agency, joint venture or any other relationship between the Parties except as may be expressly provided in this Agreement.

7. Liability

    7.1    Neither Party will be responsible or liable for any indirect, consequential, incidental or special damages (including loss of profits, loss of time, or loss or anticipated business (as a result of its performance hereunder, including any cancellation or termination of this Agreement, whether based on contract, tort, strict liability or any other legal or equitable theory, even if such Party was advised of the possibility of such damages.

    7.2    Each Party hereby agrees to indemnity and holds harmless the other Party from any actions, lawsuits, demands, claims. Losses, expenses, costs, including, without limitation, reasonable legal fees, and damages, arising from the injury, illness or death of third parties (including the indemnifying Party's employees) in any way related to the performance of this Agreement, to the extent such injury, illness, or death is claimed to have been caused by, resulted from, or was in any way connected with the negligence of such Party.

8. Duration of Agreement

    8.1    This Agreement shall remain in effect until the later of (a) that date on which IONICS RCC and IONICS RCC Affiliates collectively shall have received from GLOBAL and GLOBAL Affiliates collectively a total of $20 million in sales revenue or (b) the fifth (5th) anniversary of the date of this Agreement.

9. Dispute Resolution

    9.1    In the event a Party to this Agreement has reasonable grounds to believe that an Event of Default by the other Party as defined in Section 9.5 has occurred and is continuing, or that its expectation of receiving due performance under this Agreement may be impaired, such Party will promptly notify the other Party in writing of the substance of its belief and, as appropriate, declare that an Event of Default has occurred or demand adequate assurance of

April 10, 2003                                                                                   Preliminary DRAFT

      due performance. The Party receiving such notice and/or demand must respond in writing within thirty (30) days of receipt of such notice and provide (i) evidence of cure of an/or its ongoing best efforts to cure the condition specified, (ii) an explanation of why it believes that its performance is in accordance with the terms and conditions of this Agreement, and/or (iii) adequate assurance of due performance, as required by the claiming Party's notice. Failure to respond within said thirty (30) day period shall be deemed an admission that an Event of Default has occurred or that due performance is impaired.

9.2    If the Parties cannot in good faith discussions resolve a dispute between them with respect to this Agreement, then the Party claiming that an Event of Default by the other Party has occurred may give notice of a request for arbitration and, subject to the provisions of Section 10, such controversy will be referred to and resolved by arbitration under the most current version of the commercial Arbitration Rules of the American Arbitration Association. The board of arbitrators will be composed of three arbitrators. Each Party will choose an arbitrator and the two so chosen will choose the third. If either Party to the controversy fails to choose an arbitrator within thirty (30) days after notice of commencement of arbitration, or if the two arbitrators fail to choose a third arbitrator within thirty days after the appointment, the American Arbitration Association will, upon the request of either Party, appoint the arbitrator to consider or complete the board. The place of arbitration will be Ohio and the arbitration will be held within thirty days after the appointment of the arbitration board. The arbitration awarded will be final and binding upon the Parties and judgment thereon may be entered in any court having jurisdiction.

9.3    In connection with any such arbitration proceeding, the board of arbitrators will have the right to grant all remedies that such board deems appropriate including, without limitation, monetary damages and/or the termination of this Agreement.

9.4    Notwithstanding the provisions of Section 10, a Party may decline to pursue arbitration and elect to terminate this Agreement if any of the Events of Default by the other party, as specified in Section 9.5 have occurred.

9.5    Each of the following shall be deemed an "Event of Default" of the Party to whom such event is applicable.

        (i)    if a Party fails to perform or observe any of the terms, covenants, conditions, agreements, or obligations of this Agreement required to be observed and performed in this Agreement by such Party, and such failure continues for a period of thirty (30) days after notice thereof has been delivered to such Party; or

April 10, 2003                                                                              Preliminary DRAFT

(ii) if an Affiliate of a Party fails to negotiate in good faith, or to execute a contract or amendment thereto pursuant to the terms of this Agreement, and such failure continues for a period of thirty (30) days after notice thereof has been delivered to such Party; or

(iii) if a Party make as a general assignment for the benefit of its creditors, or files a voluntary petition in bankruptcy, or is adjucated bankrupt or insolvent, or files any petition or answer seeking, consenting to, or acquiescing in reorganization, arrangement, adjustment, composition, liquidation, dissolution or similar relief under any present or future statue, law or regulations, or files an answer admitting, or failing to deny, the material allegations of a petition against it for any such relief, or admits in writing its inability to pay its debts as they mature; or

(iv) if any proceeding against a Party seeking any of the relief mentioned in clause (iii) of this Section is commenced and is not stated or dismissed within ninety (90) days after commencement, or

(v) if a trustee, receiver or liquidator of a Party or of any substantial part of the properties or assets of such Party is appointed with the consent or acquiescence of such Party, or if any such appointment, if not so consented to or acquiesced in, remains unvacated or unstayed for a period of ninety (90) days; or

(vi) if a Party is liquidated or dissolved.

10. Miscellaneous

10.1 All agreements, representations and warranties contained herein or made in writing by or on behalf of the Parties in connection with the transactions contemplated herby will survive the execution and delivery of this Agreement.

10.2 All notices, requests, demands and other communications provided for hereunder will be in writing and personally delivered or sent by (a) certified or registered mail, postage prepaid, return receipt requested, (b) facsimile with a copy sent by certified or registered mail, or (c) recognized same day or overnight courier service, as follows:

        If to GLOBAL:
           Global Energy, Inc.
           Suite 2650
           312 Walnut Street
           Cincinnati, Ohio 45202
           513 621 0077 Tel
           513 621 5947 Fax
           ATTN: H.H. Graves
               President & CEO

April 10, 2003                                                                                    Preliminary DRAFT

        If to IONICS RCC:
        IONICS Resources Conservation Company
        3006 Northup Way
        Bellevue, WA 98004
        425 828 2400 x1364 Tel
        425 828 0526 Fax
        ATTN: Gary Podrabsky
        President

Or such other person or addresses as either Party may provide from time to time in writing to the other Party. All such notices, requests, demands and other communications will be validly given, made or served, (i) on the date delivered, if delivered personally or by fax or courier, or (ii) three (3) days after the date sent, if mailed by certified or registered mail.

10.3    Neither this Agreement nor any provision hereof may be changed, waived, discharged or terminated orally or in writing, except that any provision of this Agreement may be amended and the observance of any such provision may be waived (either generally or in a particular instance and either retroactively or prospectively with but only with the written consent of the Parties hereto. No delay or omission by either Party in exercising any rights under this Agreement will impair any such right, nor will it be construed to be a waiver thereof. No waiver of any single breach or default under this Agreement will be deemed a waiver of any other breach or default.

10.4    This Agreement contains the entire agreement between the Parties with respect to the transactions contemplated herby, and supersedes all negotiations, agreement, representations, warranties and commitments, whether in writing or oral, prior to the date hereof.

10.5    All of the terms of this Agreement will be binding upon and inure to the benefit of and be enforceable by the respective successors and assigns of the Parties hereto.

10.6    This Agreement may be executed in any number of counterparts, each of which when so executed and delivered will be deemed an original, and such counterparts together will constitute one instrument. Each Party will receive a duplicate original of the counterpart copy or copies executed by both Parties.

10.7    This Agreement will be construed and enforced in accordance with the internal laws of the Sate of Ohio without regard to principles of conflicts of law that would cause the laws of any jurisdiction other than Ohio to apply. IONICS RCC submits for itself an its property in any legal action or proceeding relating to this Agreement to the non exclusive general jurisdiction of the courts of the State of Ohio and the courts of the USA.

April 10, 2003                                                                                      Preliminary DRAFT

10.8  In the event any provision of this Agreement or the application of any such provision to either Party is held by a court of competent jurisdiction to be contrary to law, the remaining provisions of this Agreement will remain in full force and effect.

10.9  The descriptive headings of the Sections hereof are inserted fro convenience only and do not constitute a part of this Agreement.

10.10 Neither Party will assign its rights or obligations under this Agreement without the prior written consent of the other Party (which consent will not be unreasonable withheld); provided, that notwithstanding the foregoing, either Party may transfer its rights or obligations under this Agreement to one of its Affiliates. No assignment will operate to relieve an assigning Party of its obligations under this Agreement.

10.11 The Parties shall cooperate to continue to develop and optimize the E-GAS™ Technology gasification and IONICS RCC ZLD System combination.

IN WITNESS WHEREOF, the parties have executed this Agreement by their duly authorized officers as of the date first above written.

GLOBAL ENERGY INC.

BY: _____

Name: H.H. Graves
Title:   President & CEO


IONICS RCC -- Resources Conservation Company

BY: _____

Name: Gary Podrabsky
Title:   President

9

## Alliance

- Specify IONICS RCC ZLD System for all E-GAS™ Technology licensed projects.

- Term shall be later of $20 million in sales revenue to IONICS RCC or five (5) years.

- Parties shall cooperate to continue to develop and optimize the E-GAS™ Technology and IONICS RCC ZLD System combination.

- ZLD System sales subject to reasonable competitive standard on pricing and terms. For reference, the current IONICS RCC ZLD System at Wabash cost approximately $1.7 million.